Mr. Post, how are you dividing your time? Your Honor, I'm going to take the first nine minutes of the opening. No, I don't understand, but in terms of issues? Your Honor, I'm here for the Court. I intend to address the common issues that affect trade secrecy for all the appellants, but also the individual liability issues that affect Mr. Finger uniquely, and the exemplary damages issues, which intersect both common and unique issues. Okay, go ahead. May it please the Court, as I said, Russell Post is counsel for the appellant Richard Finger. There are multiple paths to reversal here. As to Mr. Finger, who is a businessman who invested $300,000 in what he understood to be a new startup, there's no evidence of misappropriation and certainly not evidence of malicious conduct that would support exemplary damages and over $20 million of personal liability. As to all the appellants, all these trade secrets are barred by prior patent disclosures and issued to the district court never even addressed in the post-judgment motion. The exemplary damages were abandoned by the pretrial order, and there is no jury finding as required to support them. And the royalties here are tainted by a failure to apportion in violation of a number of this court's precedents. And so reversal is required on numerous grounds. I'm happy to address whatever question the court wishes to address. Otherwise, I'll begin with the common point that the patent disclosures foreclose trade secrecy as a matter of law. And I want to call your attention to page 31 of the appendix, which is where the district court's order on the post-judgment motions addresses trade secrecy. Mr. Kramer, why don't you talk about the actual evidence on the four trade secrets? I'd be happy to, Your Honor. There's the instruments and then the other three things. And I guess my impression was the instrument's kind of a separate category. Correct. Everybody knows what the instruments are, and I want to put that aside for now. But the other three, the distal tabs, the use of absorbable sutures, and the internal pockets. I guess my impression coming in here is that the prior art documents that you cite, a couple of patents and the PCT application, get close but not all the way there. And that might not be decisive in an obviousness case, but it's not clear to me why it's not decisive in a trade secret case where the issue of what's in the public domain and whatnot is basically a factual question. Your Honor, I think it is not a factual question to the extent that the secret is disclosed in the patents. And I'll call the Court's attention to your decision in Ultimax Cement, which was also a California Trade Secrets Act case. But it all depends on whether it's actually disclosed. Correct. And so I want to speak to the factual question that you posed. And in particular, I want to call attention to the internal voids secret because that is the one that is unequivocally disclosed. If you look at 16-600-01. Sabrina 477. That's right, Sabrina 477. It discloses a penile implant with cavities to adjust the hardness of silicone. That is precisely the internal pocket secret that's alleged here. And it represents more than 50 percent of the total value of the judgment. It is squarely foreclosed by the Subrini patent. And if you look at page 14-557-58, you will see the expert testimony upon which the plaintiffs rely. And it fails to deal with Subrini. I apologize, Your Honor. No, no, no, no. Where in Subrini do you want me to look to find it? At 16-600-01. I can give you a column and line number. Of course, Your Honor. Let me call that up. Look at column 4, beginning at line 3. Yep. It states that it should be noted that the presence of cavities, and go on down to the end of line 4, makes it possible to give it a hardness less than that which it would have if it were formed of a solid and homogenous body. And if you look one page prior, or pardon me, two pages prior, at 16-598, you see the illustrations. And the illustrations, of course, bring this to light because they show the internal cavities embedded in the implant. That is precisely what Dr. Elist alleged was his trade secret. So this might not be quite the point that I thought. I was remembering from the papers here that it was rather important whether the cavities are fully enclosed or merely indented in. And one could use the word cavity for either thing. There was a dispute about that that related to the way the Augmenta product was ultimately designed, because it wasn't fully embedded cavities. But the point here is what Dr. Elist said was his trade secret was cavities fully enclosed in the device. And that is precisely what Superintendent 477 discloses. And as a matter of law, that should foreclose that trade secret claim. I think that We have a jury instruction which defines the trade secret. There was a jury instruction which defined the trade secret. The Court did not permit a jury instruction about the principle that disclosure in a patent forecloses a patent trade secret. I understand. But I'm saying in terms of comparing the prior patents to the trade secret, we can take the jury instruction as defining the trade secret. Yes. That's correct. That's right. The jury instruction defined the claimed trade secrets. I want to shift gears because I do want to address Mr. Finger's individual responsibility. Let's stick with this question of what was disclosed in the patents. Of course. I'm happy to. The second one is the mesh. That's right. And there it's the Finney patent. That's right. It's the Finney patent which disclosed a penile implant with suturing strips of mesh and Dacron is what's referenced in Finney, and that is a form of mesh. But not at the distal end. Not at the distal end. But then the ELIST International patent application, which incorporated Finney, disclosed the use of these types of suturing strips at the distal end. Well, I thought, and you correct me, I thought that what the PCT application disclosed were silicone strips and that there is evidence that whatever else silicone strips are, they don't encourage tissue growth. But that's where, Your Honor, you have to account for the fact that that application was incorporating Finney. And Finney referred to the use of these distal end tabs in a mesh. And so the point is that when you account for the incorporation of Finney into the ELIST application, you have all the components of this alleged secret. It's right there in the public eye. And the best spot in Finney is? Your Honor, I would look at 16607 to 10. Right. But Finney is a tiny, tiny patent, so. The language of the trade secret is in or around the distal end, whereas some of the witnesses seem to assume that it had to protrude from the distal end, which is not part of the trade secret. Your Honor, I think the testimony was that this idea of mesh tabs was the tabs that extend from the distal end. The way in which the trade secret is. No, what I'm saying is that some of that testimony is not relevant because the trade secret. Because of the definition. It doesn't say extending from the distal end. It says in and around the distal end. That may be correct, Your Honor. I mean, I'm trying to harmonize the instruction with the testimony that was given and just to acknowledge that if you accept the plaintiff's testimony as it being a fair application of that instruction, it's fully disclosed by Finney and the ELIST international application. And we, unless you have other questions. I guess I'd. Of course, Your Honor. Can you be more specific in Finney? Yes, in Finney, Your Honor. I would. This kind of thing really does make a difference. Of course it does.  I would point to. Let's look at the abstract. Right. Midway through the abstract. Right. Makes clear that the sleeve includes suturing strips on the inside wall that facilitate the suturing of the sheet. And at the bottom, the last two lines, it states that the suturing strips are of Dacron fabric, which Dacron is mesh. And if you look in the next two pages, you can see the discussion of these suturing strips. And, for example, I think a good illustration here would be at 16609, column two, lines 33 to 37, which allude to the illustrations and point out that you can see the suturing strips that are attached to the sleeve. Right. This, I don't think you've identified something, unless I've missed it, about the tabs at the end. The distal end. The distal end. And that, Your Honor, is because Finney has incorporated then into. Carson testified that Finney showed at the distal end.  That's exactly right, Your Honor. Carson conceded that Finney showed this. That's at 14653-64. That's plaintiff's expert conceding that point. 14? 14653-64, Your Honor. Or, pardon me, 14653-54. And the point, Judge Taranto, that I was making in response to your question was it's the ELIST international application that then incorporates Finney and applies it to the distal end. And so that discloses the entire secret as a matter of law. I want to make certain that I have an opportunity to emphasize the lack of proof with respect to Mr. Finger individually. We'll get there. Okay, very good, Your Honor. I apologize. Can we move on to number three now? Yes, of course. So number three is this combination of absorbable sutures in the mesh.  And so that is disclosed by the Kim patent, and that appears at 17-080 of the appendix. And it appears specifically in column three at line 30. 080? 17-080. Correct, Your Honor. Column three, line 30. The multiple slits implant is then applied to the space and fixed on the back's buccal fascia with an absorbable suture. And the multiple slips implant is itself a mesh structure. And so I call your attention in column four to line 40, where this is explained further. The patent says it is fixed to buccal fascia using an absorbable suture. Then the dermal tissue is incised to form a mesh structure of multiple slits. So it's absorbable sutures with a mesh structure. The only argument the plaintiffs make is that that mesh structure in this patent is natural tissue as opposed to mesh, but that makes no difference to the idea that is disclosed, which is the use of absorbable sutures with mesh. And so that definitively forecloses all of the trade secrets. I see that our opening time has expired. I'm happy to answer questions about the other issues. I want to go on to number four. I appreciate it, Your Honor, absolutely. It's a privilege. And with respect to number four, I take it your contention is that this was a failure, not only that it was generally known, but there was a failure to keep it confidential? Your Honor, there's three points. Is there an online video? There is an online video that reveals the use of most of the instruments. The instrument list itself is not anything unique or distinctive. The instruments are common knowledge. They were not protected by any confidentiality. And I would point out the simplest way to deal with this is that a trade secret must derive independent economic value from its secrecy. If you look at the pages of the brief where the plaintiffs argue independent economic value, they never even refer to the instrument list, and no surprise, because no one could credibly say that the instrument list creates independent economic value. So it's an easy way to decide that trade secret claim without even getting into the question of whether it's confidential. Okay. Unless there are further questions. Wasn't there some evidence that there were several instruments on the instrument list that are generally just not used at all in this type of surgery? Your Honor, the evidence is that all of the instruments on the list are regularly available and regularly used in surgical procedures. Not all of them are used commonly in standard urological procedures, but there's no instrument on this list that is special and unique. And, in fact, on the contrary, Dr. Elist has promoted his procedure by saying any surgeon can do it with conventional surgical instruments. Why do you think it's enough that, say, some instrument that has never been used for urological work and has been used, I don't know, in heart surgery or something, why would there not be an eligible trade secret, or at least a possible eligible trade secret, putting aside whether it's been disclosed, the other reasons? Well, Your Honor... I think a different version of Judge Rehn's question. And I certainly want to make sure that I'm engaging with this question fairly. I think the point would be that if all of the instruments are conventional surgical instruments, which I believe it's undisputed is the case, and there's no distinct value that derives from the particular list of those instruments in this case... That's a different point, I think. That is, I think, a fair point, Your Honor. And I would say, again, I think that's the simple way to decide this alleged secrecy claim without needing to worry about whether there's a particular magic instrument that's included in this list, which I think the evidence indicates that's not the case. Well, the list was sent by e-mail. The list was communicated, that's right, without confidentiality, that's right. In the video or separately? Separately to Dr. Cornell. I knew a third party, too. That's correct, that's correct. Judge Dyke has answered the question for me correctly. Unless there are further questions on these trade secrets, there will be a couple of minutes to talk about Mr. Finger. Good. I'll take advantage of that freedom to make two points. First, there is no evidence in this record that Mr. Finger, who was an individual investor, had knowledge of these secrets as required to impose trade secret liability or had any reason to know that they had been wrongfully possessed. At the most, what he knew is that Dr. Cornell had attended a training session. Dr. Cornell said that very little was discussed. There was no discussion of these design concepts, and Dr. Cornell represented in the PPM that he had independently developed the product. That is no evidence upon which a jury can draw a reasonable inference of misappropriation, and I call your attention to two cases from the California courts. One is the Silvaco case in 2007 that held that mere knowledge that a party might claim misappropriation of a trade secret when there is a dispute is not itself a basis to charge an inference of CENTER. The second case is the Hook Media case from the California Court of Appeals in 2020. That's a case where a new employer had engaged employees who had confidential information. There was some evidence that the employees had used that confidential information, but the Court of Appeals held that was no evidence to impute knowledge of that to the employer. Mr. Finger is in this situation exactly. Whatever Mr. Cornell did or did not do with respect to Dr. Elist, Mr. Finger had no reason to know he was lying, if he was lying. And so Mr. Finger can't be liable. And that brings me to the last point that I would make is the exemplary damages here depend on a finding by the court, which is highly irregular, and I say waived by the pretrial order, but a finding of malice. California law requires proof of both willful conduct and malice. And in the applied medical case in 2024 and the Champion Systems case in 2024, the California court said malice is different. It requires proof of intent to cause harm or despicable criminal conduct. The plaintiffs here have not cited any evidence of malice by Mr. Finger. At most, they've cited evidence that they say would go to willfulness. That's an easy issue. Okay. I think we're out of time. I appreciate the time. Thank you, Your Honor. We have two minutes for rebuttal, and we'll have Ms. White. Thank you, Your Honors. May it please the court. Subject to the court's questions, I'll spend a brief amount of time talking about the royalty award and the problems with the royalty award. There are several, and the court should remand at minimum on the royalty award. As this court knows, there's a requirement to apportion between the aspects of the product or the profits here, the projected profits, that relate to the protected idea, the trade secrets, and those that don't. That did not happen at all. What are some of those aspects? So this gets a little complicated because the trade secrets, it's undisputed, are not actually in the augmented product. So when we're looking at apportioning, you can't actually apportion with the product. So at most, what they could have done is said, we need to apportion the projections that Augment had put together, what they thought they could earn with the trade secrets versus without. With a product that would incorporate the trade secrets.  So what else would be of value in said product? In the not yet made Augmenta product that incorporates the trade secrets? It would be everything that is not the improvements. What is the everything? That would be the PANUMA. The implant, there was already a commercially available implant, the PANUMA. The trade secrets are supposedly an improvement on the PANUMA. So if you took the projections that Cornell had back then, the thing that we have in the record that they could have been based on that weren't the improvements is the PANUMA. The PANUMA had, the year before the hypothetical negotiation would have been occurring, did not even have a million in profits. So if you look at the actual product, the one thing we know doesn't have the trade secrets in it. It's nowhere near the base that Arst used. Would I be right? So it seems to me, I guess, two thoughts are coming in a row. One is, okay, there's improvements on an existing product. So the existing product might have some value. Second thing is, you're telling me that existing product had really, really, really small value compared to the rest. So if you're going to subtract something, you might not be subtracting very much. Nobody wants it. I'm exaggerating. Nobody wants the PANUMA without the improvements. Not nobody. Compared to what they projected. The problem is that the Augmenta also doesn't have the improvements. Well, it doesn't now, but aren't you measuring against the what-if Augmenta product that included the trade secrets? I may be misunderstanding. I don't understand why you keep talking about how the current Augmenta doesn't have them. Because, and I'm sorry, Your Honor, I'm trying to understand your question as well. And if I'm understanding it now, the question is that the PANUMA as it existed had very little profits. So the projections must be just because of the trade secrets. Is that what you're testing?  So that could be the case, but that analysis was never done. ARCE did not do that. What ARCE did is said, I'm assuming the Augmenta, everything about the projected profits for the Augmenta, those are coextensive. So you are correct that maybe that is the analysis that needs to be done. It was not done here. And that's the problem. So at minimum, we need a remand for that. There are also problems with the royalty rate. It has to be sufficiently tied to the facts of the case and the two comparable transactions that ARCE used. Did you have a question? No. Okay, I'm sorry. I wanted to ask one thing about the exemplary damages. I don't see how there was a waiver in the pretrial order. The pretrial order says, we're going to try damages, full stop. It doesn't distinguish among different types of damages. And then, what, two weeks later, there's a stipulation that says all the yet undetermined damages, all of them, are going to be for the judge, not the jury. At that point, why wasn't it your obligation to say all the damages are in the case? We've all just agreed they're going to the judge. I have to assume, as I think the district court ultimately said she did assume, that that meant all the issues that go into the damages, including the exemplary damages, are going to be tried by the court. And if you disagreed and said, no, we would like that one to go to the jury, it was your obligation to ask. The answer to your question, Your Honor, is that the characterization of the stipulation that you're operating under is incorrect. So the stipulation was that after liability, the court would determine whether to award a reasonable loyalty. But it seems to me you've made two different points. Your main point has been the pretrial order waived it. That happened, what, May 24th, 2023. No stipulation until June 5th, I think it was, 2023. I don't see how you can say, literally, I do not see how you can say the pretrial order waived a claim to exemplary damages. It said damages is what we want. That's going to be tried. And I understand Your Honor's point now. The pretrial order, the reason we say it waived it was that willful and malicious misappropriation have been pled as a separate thing. You are right that exemplary damages is part of damages. What was not identified in the pretrial order is that they were going to be pushing for the predicate liability finding of willful and malicious misappropriation, which has its own elements. So damages. When you say willful and malicious misappropriation was separately pled, what do you mean? I mean that in their petition they had said you have misappropriated trade secrets and you have also done so willfully and maliciously, and that is what entitles us to exemplary damages. Our point about the waiver and the joint pretrial order is that there's a special liability finding for exemplary damages, and that's not identified as something at issue anymore. And so for the defendants to know that that's being tried, we have no way of knowing that. It's not in the joint pretrial order. And the exemplary damages follow from that liability finding. It's the liability finding that they waived by not including in the pretrial order. And when you say liability finding, you're referring to? I mean the predicate liability finding to exemplary damages. You're referring to something in the operative complaint? Yes. What I am referring to is that in their willful and malicious misappropriation. Oh, I'm sorry. I'm sorry. I'm in complaint. I'm sorry. I'm sorry. In the complaint, willful and malicious misappropriation is set out as the basis that they will use to seek exemplary damages, because they can't just get exemplaries based on a liability finding misappropriation. They need an extra finding. And our point about waiver is that in the joint pretrial order, they do not identify that as a factual issue that's going to be determined whether the misappropriation was willful and malicious. Okay. I think we're out of time. Thank you. Mr. Mammon. May it please the court. Nathan Mammon on behalf of the plaintiffs. I'll start wherever your honors want, but I'll start since the question began with the trade secrets. I'd like to address those questions first. And the first thing I'd like to point out is I think a critical thing that was alighted over with these trade secrets is what they actually are, the context of these trade secrets. If you look at the trade secrets in the jury instructions, they're in a cosmetic penile implant. That's a requirement for the three structural trade secrets. They all have to be in a cosmetic penile implant. Sabrini is not a cosmetic penile implant. It's a therapeutic implant. That's a different type of implant. There's testimony in the record that the jury, in making its factual finding, was able to hear and figure out.  So where is the testimony that it, for a purpose, let's take these trade secrets one by one, that with respect to this first trade secret about the pockets, that it made a difference whether it was a cosmetic or functional implant? Yes, so the testimony you could find at appendix 14557. 14557? Yes, that's plaintiff's expert Drury. He was a technical expert. And then there's another expert, Dr. Carson, that I'll refer to. And the way the trial was- Wait, wait, wait. I'm sorry. 14557? 14557. Okay, so where's the testimony here about the pockets being different for cosmetic and functional implants? So there's a few different places, Your Honor, that I may have to point you to. But 14557, there's the discussion of Sabrini. And I think it's important to note that the way this part was presented below, the defendants threw up a lot of prior art. And so he's addressing the art as a- Show me where your witness says that it's a difference, whether it's from the point of view of this first trade secret, it's a cosmetic or a functional implant. So the cosmetic point, I will have to look back at what Drury said. I'll point you for the cosmetic distinction if you look at 14636. 14636? Which is Dr. Carson, who's also an expert. 1636. And- Go ahead. Yeah, here. So the context, again, as I said, there was art that was presented together, including the small carry-on prior art and Sabrini. And he's discussing how these two references aren't the same. And Dr. Carson here explains the therapeutic implant- Where? Well, it's, if you look at starting on line one, where he's talking about the small carry-on implant, and then you also see down below, he ties it in at line 19 with Sabrini. Sabrini says it's a therapeutic penile implant. It's designed, a therapeutic implant goes in- Okay, but where does he say it makes a difference from the point of view of the trade secrets? Well, it makes a difference from the point of view of the trade secrets because the trade secrets are limited to cosmetic penile implants. I mean, that's, it's not the same- Okay, but look, there's a Ninth Circuit case about the California Trade Secrets Act in Cussler versus Kawasaki, which is sort of interesting in relation to this because it was, there was a trade secret that claimed that having bubbles under the hull of a jet ski made it operate better. And the court said, no, that's not, that's well known because while there's no evidence that it was known for jet skis, it was known for boats generally, and there's no difference between boats and jet skis, they're kind of both. So, you know, what I'm asking you, is there some testimony here that from the point of view of this particular trade secret, the voids trade secret, makes a difference whether it's a cosmetic implant or a functional implant? And so far, you haven't shown me any testimony that addresses that. Your Honor, I respectfully think we're switching it to say, well, what's this trade secret versus, or what's the particular feature versus talking about the trade secret is a cosmetic implant. The only cosmetic implant that was ever on the market is my client's, and these are additional improvements to that. And so I think it does matter that it's in the context of the cosmetic penile implant that no one else, he would have his own improvements to the product that he developed. So would it be fair to say that there's no testimony that relates the trade secret to the type of implant, but you're saying it's just a different kind of implant because inherently cosmetic and functional implants are different? Your Honor, I don't think it would be fair to say that. I mean, we discuss, you know, have a lot of, try to be detailed with the record in the opening brief, talking about what the testimony was and about how even Dr. Cornell acknowledged differences between cosmetic implants and therapeutic implants that go in different parts of the body. I mean, I think, again, these are fact issues for the jury to decide of whether a prior art discussing something in a therapeutic implant, whether that is, you know, and we're even meshing terms here. This is trade secrets. This is not patent law. We're not talking about obviousness. Trade secret has... Okay, so as far as this first trade secret is concerned, the difference is you say it's about a functional implant, not a cosmetic implant, right? And specifically because it's an implant that goes into corpus cavernosum. It's not a cosmetic implant that goes in a different part of the body. And the jury heard evidence, the defendants presented evidence about what they said Subrini disclosed. The jury heard expert testimony from both sides. And the jury found, as a matter of fact, that Subrini did not disclose this trade secret. Let's put it this way. Let's suppose we were to conclude that there is no material difference between a cosmetic and a functional implant. Let's assume that. I know you don't agree with that and you argue to the contrary, but let's assume that. Is there any other difference between Subrini and this trade secret? Understand or resist your hypothetical, but taking that, on the art itself, I mean, if you're assuming that Subrini is essentially a cosmetic implant, there's other, not necessarily a testament I could think of to point you to about Subrini. I think the testament is relevant that Subrini is not something that's ever been commercialized. It goes to the point of whether this was known, and it goes to the point of trade secret. Whether it's been commercialized or not under the cases is not something that's relevant. Does one but not the other have fully enclosed cavities, or does the fully enclosed cavities appear in Subrini's therapeutic insert? My understanding is Subrini's, it is an enclosed cavity. My understanding is that. So it really comes down to this, the different kind of implant, which goes in different parts of the anatomy to serve different functions, whether it's like the boats had jet skis, no material difference. I think the question that Judge Dykes has been asking you is, what specific evidence says here's why the fully enclosed cavities would make some difference because of the different locations and functions of the two different kinds of implants? I'm not asking you to concede that that's the decisive issue, but what is the evidence? Again, I point to, in the testament, I know we cite it in the briefs, but Dr. Elis explained the differences between what he has as a cosmetic implant and a therapeutic. Dr. Carson, the expert, talking about that, that when you're designing the cosmetic implant, you're taking different things into consideration. So yes, we may be talking about similar, screws are used in a lot of different components, but it doesn't mean that you might have one aspect of use of that part or that feature that may be a trade secret or not. Was there testimony, I think there was testimony that having the cavities can make it lighter, right? It makes it lighter, makes it a more natural feeling, more... And is there some testimony that that matters more for the kind of wraparound cosmetic thing than for the more internal therapeutic thing? I don't know specifically. Certainly there's testimony about it being important for the wraparound and for the natural feeling that it creates for the wraparound. I don't know if I can point you to a testimony that says, and that distinguishes from therapeutic, because the testimony on therapeutic was, we're talking about a different purpose. The purpose of why you use a therapeutic is totally different than the purpose of this cosmetic. But again, I don't want to be a broken record, but it's important. There's nothing, I like to counter what my friend said, that none of the prior art, if you want to use the term, along all fours with the trade secrets. None of it discloses exactly what is claimed as a trade secret. And that becomes a fact question then for the jury to determine of, okay, we hear what you're saying pointing to the prior art. Here's what we've been instructed the trade secrets are. Does this prior art actually disclose the trade secrets? And the jury found no. Okay, so can we go on to trade secret number two? It's the same argument you're making with respect to trade secret number two, that it's a cosmetic implant rather than a functional one. With trade secret number two, the point of appendix 14336, this is Drury talking about that the mesh patches that run the length of Finney aren't like the patches that are at or around the tip. And the purpose of the patches at the tip in a cosmetic implant, again, are different because the cosmetic implant is going to move in different ways and designed to move for different reasons. Carson conceded that Finney has tabs at the distal end. Yes, that's to promote tissue growth. He gave that answer in cross-examination, but he gave other testimony as well that the mesh tabs weren't there at 14623. And the jury reconciled that expert, both what he said in one place and then a cross-examination question. What did he say at 14623? That the mesh tabs were not used for functional. Sorry, I'll go there myself. Line 21, 22. I'm sorry? Lines 21 and 22. Thank you, Your Honor, yes. That you're taking these implants, the reason why you wouldn't take the Finney teaching is because they're not used in the same way. Again, the importance of this being a cosmetic implant versus being a therapeutic implant mattered to the trade secrets and what was being done here. Okay, so that's the difference, again, with respect to trade secret number two. Well, that's a different point. I don't want to waive the things that we're not going to brief. I'm not waiving it, but we're here to try to figure out what's not. Yes, sir. If there's some other reason that Finney doesn't disclose this trade secret other than the difference between functional and cosmetic, show it to us. Yeah, so 14336 through 339, Mr. Drury is discussing Finney. He explains that the Finney mesh patches that are discussed aren't like the mesh tabs of the distal end, and that's his testimony. What is he saying? What are you talking about? 14336. 14336. 14636. 143. You're right. Sorry, Your Honor. 636. Lost my notes. 336. 14336. Is Drury. Yes, Drury is on that, Your Honor, our technical expert. He discusses, I mean, carrying on through 14337 through 338. He says on line 15, he says the trade secrets are mesh tabs extending from the distal end, but that's not the definition that the district court gave to the trade secret that the parties agreed on. Again, I mean, he gave that testimony, yes, but the jury was instructing the trade secrets, and they were able to take that. I mean, his testimony is not excluded. He's defining the trade secretly differently than the district court did. I think, you know, at most, perhaps it's not precise language that he should have used, but I don't think it's different. And, again, this is. Extending from and in and around seems to be different. But the jury heard that testimony, and they were instructed. We presume the jury follows its instructions on determining what was the trade secret, so they have to determine what was there. And if you look at 338, he talks about, you know, how those, you know, and Finney is not the same thing as the trade secrets in this case. There's reference to ELIS as well. And ELIS, I think, Judge Schroeder, you noted. It's a PCT application. It's a PCT application, yes. The PCT was a silicone tab that wasn't a mesh. So, again, it's not doing the same. It's not even existing for the same purpose of allowing tissue things. Do I remember right the language was silicone netting? I'm not going to challenge your honor. I mean, I think, but I think it was silicone. The testimony was it's a silicone. It's not open in the sense that tissue could ingrow as with the mesh concepts here, which the trade secret requires. It allows tissue ingrowth. The absorbable suture point, the reference on Kim. My friend pointed to Kim and said, well, Kim shows slits. Kim's not a, what would I say, a, it's fat. It's taking fat from the buttock and using that as an implant. I mean, it's not even talking about a silicone implant or cosmetic implant of that style at all. It's a different, we're not disputing absorbable sutures are known. I mean, there's testimony on that. It provides the use of absorbable sutures in this application with a silicone, cosmetic silicone implant. I don't understand what's the trade secret. Absorbable sutures are used in all kinds of surgery for decades, right? And the testimony establishes that. They were used in all kinds of surgery. They'd never been used in a cosmetic penile implant surgery. And there's testimony, I mean, that's clear. Phinney discloses mesh with sutures, but it doesn't say they're absorbable, right? I don't believe Phinney discusses absorbing, no. So that's the difference? I'm sorry, about Phinney? Yeah, about Phinney. Phinney shows mesh and sutures. But it doesn't say that the sutures are absorbable, correct? It doesn't say that sutures are absorbable. And Phinney doesn't disclose using, as we talked about with the second trade secret, using the mesh taps. They're not the same mesh taps. I mean, Your Honor may dispute that. That's a different one. But I think it's part of trade secret three is the mesh tap. So it's a trade secret to use absorbable sutures with a particular mesh and a particular implant? I mean, that seems to get back to this Ninth Circuit case, right? I mean, trade secret law protects a broad amount of subject matter. It's not patent law. I know we approach this and we think of this as how we approach patents. But these aren't the same. We're focusing on some of the very specific issues. For example, I could imagine, but it's just my imagining, that there might be a difference in whether you use absorbable or not absorbable according to how fast they dissolve, how fast the tissue grows, the place and how much wear and tear that place is going to get. Was there any testimony about that sort of thing? I don't, I'm standing here, I don't recall. Again, I don't want to, you know, I laid out a lot of, there's a lot of issues in this case and I've laid out the facts in the brief. But I don't recall specifically, as I understand your Honor's question, I think there's testimony about using absorbable sutures and using them in this context, which again, trade secrets allows protection of context, new uses here. Right, but I guess we've been trying to, I think the questions have been trying to think about, you know, is this like or unlike the Kawasaki case that was described where, you know, a very strong kind of layperson's first intuition is there's no difference between these things. And so you really want to have some evidence saying it, saying that here's why there is a difference. And the question is, at least in my mind, is there evidence about why there, it's plausible that there is a difference here so that it really would become a jury question as opposed to we just don't see a reasonable basis for saying there's any difference. Well again, if you go back to the beginning of Dr. Ehlers' testimony, talking about the difference in what he does in surgeries with therapeutic versus cosmetic, how he developed this, the reason he developed these technologies, I mean he walked through that. Dr. Cornell in his testimony admitted the differences between therapeutic. Related to the trade secrets as to why it would make a difference, for example, to use non-absorbable sutures for functional is different from using it for cosmetic. I mean, on the face of it, it seems a little unusual that there would be a difference, but there's no testimony saying there is, right? Well, I think, again, the jury's on how to take this evidence and put it together in a way, you know, and this court is reviewing for substantial evidence here. And what the jury hears about the importance of difference, the importance of differences between these two type of implants, why Dr. Ehlers developed and was contemplating and developing the potential way of using mesh tabs for a cosmetic implant, why the defendants in the documents that discuss taking this idea and how they're going to distinguish Pneuma, they're talking about the advantage of these things. I mean, these are all things that are for the jury to determine that what did Dr. Ehlers have, how did the defendants develop this technology. They weren't looking at the prior art. Let's go on to number four, where you have this video and you have the e-mails, and there's the question of whether it satisfies the confidentiality requirement. Well, I don't believe, I'm not aware of any challenge that the e-mail somehow wasn't confidential. I mean, it was from an IMD agent who was requesting, and at this time, Dr. Cornell had signed the NDA. And there's no evidence that it was confidential, right? I disagree. I think there was evidence. Dr. Cornell had attended the surgery. After the surgery, he asked for this information. He gets it. As far as the actual information, I think even the defendants aren't arguing that you can see everything in the videos. But it was sent to a third party also. The third party, it was sent by an agent of, I mean, I'm not aware of a testimony saying that it was sent to anyone other than people subject to the duty of- No, no, there's testimony that it was sent to a third party, and there's no evidence that third party was under obligation of confidentiality. Okay. I, that's not my recollection of the facts, Your Honor, but I will, you know, I think that it was sent by, at least Dr. Cornell got this evidence, or got the list from an IMD sales agent. What about the online journal publications that included a video? Yes, so the video doesn't disclose all the, it's not a comprehensive instrument list. The testimony was that, well, you could see some instruments used, but not all of them. And Dr. Carson, who's a practicing urologist, talked about the instrument list. And you could find this at appendix 14-643. He's talking about why the instrument list matters. And what he explains is that when you're in surgery, you have an operating room, you're paying for the operating room, your patient's under anesthesia, under surgery, time matters in this context, right? And you even heard my friends acknowledge that, well, you may not have, for common urology surgery, you may not have all those instruments. So the video is for the whole surgery? I'm sorry? The video is of the whole surgery? You know, I don't call it the whole surgery, but I think it's undisputed it didn't just show all the instruments being used. Undisputed? I don't think that's undisputed. I thought today that they acknowledged that it doesn't show everything. I think there's testimony that it showed everything. And I think there's some offhand remark that maybe it didn't, that one snapshot, that is one picture, didn't show everything. My recollection of the record, Judge Ike, is that it actually doesn't show everything. I don't think the defendants argued it doesn't show everything. But at the very least, Your Honor, this is a fact question for the jury. That's why we have juries as fact finders. They could present evidence that showed everything. We presented evidence that didn't. This is for the jury to decide those factual questions, and they decided those here. So unless there are further questions about this aspect, I'll give you a couple minutes to go into other things which you want to talk about. Yes, thank you. I'm happy to go to whatever issue, if there is one. Attention, let me address Mr. Finger, I guess. I think this evidence that my friend said that there was no indication that he had any involvement, it's just not true on the record. And I can give you, if you'll indulge me, he knew before he ever invested in this with Dr. Cornell, that Cornell had attended this and had an NDA. He knew that he attended the training. Finger received Cornell's drawings from Michie and the description of the advantages. He received those in, I think it was August of 2018, and forwarded those on to Clark Medical for design. Do we have those drawings in the record? They are. I think Appendix 16067 is the email that he forwarded from Mr. Cornell or Dr. Cornell. How many of the trade secrets are shown in those drawings, if any? The drawings show, the discussion in the email that he forwarded discloses, let me find my notes, discloses the mesh tabs, discloses absorbable sutures. So those are there. And then he attended, Finger attended a meeting, and I believe it was September of 2018, which was, that's an appendix, testament is at Appendix 13974. And Appendix 14189 is where this starts, where Finger shared his notes and shared with what he learned from Elist, and those notes are in the record as well. And there's a lot of testament, there's a testament in the record, there's a lot of mention of Elist in this meeting. And that's where the honeycomb design came mentioned as well. And I think that the important thing to also note with Finger's involvement, if you look at Appendix 16312, that was the personal placement or product placement memorandum, the investment memorandum that Finger admitted he helped draft. He's identified as being the CFO of Augmenta and says that he will provide financial management and oversight for Augmenta and assist Dr. Cornell in overseeing the development work being performed by Hopkins Medical Technologies. And then if you look at, he acknowledged, he wrote part of the provision talking about the risk of a loss from Elist. That's 1613. He, at 1654, is updating investors about the development work that's being done, the test. And... Can I just ask you to go back for a minute? Yes, sir. You pointed, I think, us before to 16067 is an email, and there are some notes at 16069 to 71, and then some other notes, handwritten notes, at 16100 to 102. Which of those were seen by Mr. Finger? So looking at... Or are they, yeah. What are they of? The notes on, I'm sorry, Your Honor, 16069, is that your question? That's one of them. That's September 25th, 2018. Yes, that's the notes of the meeting. Okay, and then the next one, I guess the 16100 is March 8th, 2017. Was that one involving Mr. Finger or not? I'm missing that date, I'm sorry. Which page, Your Honor? Oh, that, no, those, sorry, those notes, I see them at 16100. Those are... I'm asking because that one says mesh at distal tip. No, those are notes of meetings that Dr. Elist, my client, had with the engineering firm that was helping him develop the trade secrets. Okay, so you said the notes, 16069 to 71, and you think that they say something about these trade secrets? Yeah, if you look at, if I could turn you back a page to 16067. At the bottom of that page, this is, again, an email that Cornell sends to Finger to begin with, and the top of it is Finger then sends it on. Cornell sends this to Finger in July of 2018, and says the implant comprises soft durometer silicone with embedded mesh tabs that extend from the distal, dorsal, lateral, proximal, and ventral margins and permit tissue ingrowth over the buck's fashion. And then it says allowing absorbable sutures. I mean, that's the trade secrets right there. And so I think, you know, there's a reference to a California case. I think that the case that I think is really important to address in this context was we cite three different iterations of it, but it was the Ajaxo versus E-Trade case, where the California appellate court had different opinions dealing with trade secret law. The 2005 decision, that's 135 California Appellate 4th at 21, that actually talks about this type of scenario exactly, where the person being found to have been a willful misappropriator wasn't the one who actually received the trade secrets at the time. He received it from the person who actually did take the trade secrets, and that company was called Everypath. And the courts affirmed a judgment of willful misappropriation saying that Everypath's management must have known the technology its engineers developed came about in too short of a time for independent development, yet they failed to investigate why. In short, they best turned a blind eye to what was happening. And that court found that that was enough for willful and malicious misappropriation. That same thing here is applied. Mr. Finger knew all along what was going on. He was involved in the development, and I don't think it's an accurate record of the record below, or accurate recitation to say that somehow he was just this passive investor. Okay, I think unless we have other questions, we're out of time. I didn't address re-enrollty, but if you don't have any questions, I'm happy to address that, Your Honor. I think we're done. Thank you.  Mr. Post. I think it's apparent from the questioning that there really should be no trade secrets in this case, and so we shouldn't have to dwell much on Mr. Finger's evidence, but I do want to speak directly to those questions very briefly. The record citations that counsel provided to the court, you will notice never make any reference to the internal pockets idea, one side or another. I mean, why would that matter? Why isn't one enough? Because, Your Honor, they submitted four distinct trade secret questions, finding liability on four distinct alleged secrets. Oh, I see. And the pockets are the big dollars. That's right. The pockets are more than 50%, and nothing that they've cited makes any reference to the pockets. And the only document he pointed to that relates to the mesh tabs and the absorbable sutures is Mr. Finger forwarding a description authored by Dr. Cornell. Mr. Finger had no reason to doubt that Dr. Cornell had independently designed the product as he represented. That's not evidence of scienter. It simply does not support a verdict as to Mr. Finger, but it frankly shouldn't matter because the exchange with counsel makes clear that none of these are protected secrets. All of the arguments that you've heard come down to one distinction, which is that somehow the context in which the idea is applied changes the effect of the patent disclosure. And that is fundamentally wrong. The essence of the patent bargain is when you place the idea in the patent, you place it in the public domain. But, I mean, just at that level, the idea here to take the first trade secret is pockets in a cosmetic implant. That's not in the prior art. Your Honor, the distinction between a cosmetic and a therapeutic implant... Well, now that's a factual question. And the question is what evidence is there that that difference matters or that it doesn't matter. And there is no evidence that it matters. I guess my starting intuition is to think, boy, it really may matter. So now I want to hear from you why it doesn't matter. Your Honor, because the idea of... There really are different parts of the body. One is closer to the skin than the other for serving different functions. Your Honor... Why would one assume it doesn't matter? I want to take this question very sincerely on face value. The idea of, for example, using internal pockets to soften silicon does not matter between cosmetic or therapeutic implants. It has the same physical consequence either way. The Goosler decision, to which the Court has alluded, said that ideas dictated by well-known principles of physics are not protected by trade secrets. And that's what you have here. So the fact is that the idea of using cavities to soften silicon was disclosed by the prior art. How that might be applied in commercial applications makes no difference to whether it's a secret. And the Ultimax concrete decision from the Ninth Circuit, I think, squarely establishes that point. Did you have evidence essentially saying what you just said? Cases that don't involve this particular thing. We did. Establish a general principle. We did, Your Honor. And to the extent the Court would care to take a look at it, I would point to, for example, at pages, I think, 14, 986 to 88, you would see the defense expert testimony on the issue of internal voids. This is from Dr. Mulcahy. That's from Dr. Mulcahy. And I haven't dwelt on that since we didn't have the burden of proof. But the point is that when the Court presses the plaintiffs to establish some basis to differentiate their supposed trade secrets from the patent disclosures, their only argument is that somehow the context matters. That is not the way trade secrecy law works with respect to patents. Once the idea is in the public domain, it is no longer a secret regardless of its application. But I'm not – well, it depends what you mean by works with respect to patents. Do you mean with respect to patent law or with respect to what a patent discloses? Because there's a big difference, right? The obviousness standard is it's a standard in patent law. It's not the standard in trade secret. One possible difference is that patents are not supposed to protect against independent discovery by an ordinary skilled partisan. But trade secret does protect only against the miscreant appropriator. But the point is that when you place the idea in the public domain, you sacrifice the ability to claim trade secrecy in exchange for the limited monopoly of patent law. The term public domain is a tricky one, right? We sometimes have used that to cover what's obvious. That's not – that cannot possibly be the meaning in trade secret law. May I call your attention, Your Honor, to this Court's decision in Ultimax Cement? And I'm going to just quote because it speaks directly to the point you just made. It uses the term obvious or something like that, but not with a focus on this. It is focused on trade secrecy protection under the California statute. And this Court said it is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain— I'm sorry, that's of course true. Yes. What is anticipated is in a public domain, in the public domain, in a way that would suffice for trade secret. What is in the public domain, only because it's obvious from what was put in a published document, does not necessarily imply protection as a trade secret. Well, Your Honor, I think what these cases establish and what the Gussler case from the Ninth Circuit likewise establishes is once the idea is placed in the public domain, the protection of trade secrecy is gone. And you can't differentiate the way in which the idea might be used to claim that it somehow becomes a secret. The problem is, I mean, these are important questions. There just is not a lot of law about it. I mean, I think everybody agrees that the obviousness standard is not the standard of trade secret law. At the same time, it doesn't have to be exactly the same context. That's correct. And that's my point. And the question is, what does this record tell us about whether the context matters or not? And I think the point would be the ideas are all squarely disclosed, and nothing in this record provides any evidentiary support for the idea that the unique context here matters. It was the plainest burden to prove a trade secret. You ask pointed questions about each of these alleged secrets. Counsel could not cite any evidence that actually established any meaningful distinction for the context. How would you define context? Is it the same field, the same industry sector? Well, the plaintiffs are trying to suggest that different commercial applications within the field of medical devices and, in fact, implants, and, in fact, even penile implants is somehow a sufficiently different context to create an opportunity for trade secrecy when ideas that are disclosed in that field with respect to these specific design features are disclosed in patents. Wherever you draw the line, that's no line. This is in the medical device industry. It's dealing with penile implants. It's disclosing these very ideas. They're simply saying, well, because it's therapeutic versus cosmetic, there's a difference, and there is no evidence that establishes that there is any difference. And for that reason, the court should reverse and render a judgment against all these trade secret claims. I appreciate the court's patience. Okay, thank you. Thank both counsel. The case is submitted.